All right. Court calls the next case, which is Watson v. Plocher Construction Co. 5-11-0072. And, um, Mr. Cluchar? Yes, Your Honor. All right. Please be seated. Good morning, Your Honors. I'm told. May it please the Court, Before you cross here with Brown and James, on behalf of Defendant Plocher Construction Company, this case involves an incident where the plaintiffs, William and Selma Watson, were operating an aircraft with a trailer on May 15, 2005, going southbound on 255 at mile number 13 in the construction zone. This was in the early hours of the morning when they struck what's known as a man lift, a piece of construction equipment that has a bucket on the boom. It's hanging over 255. This caused damage to the truck, and the plaintiffs have alleged, specifically Mr. Wood, Mr. Watson, has alleged personal injury. This case was tried two days before the bench trial before Judge Guido. There was a judgment for the plaintiff on December 16, 2010, in the amount of $207,588. There are three issues the defendant has presented in the brief, and I'm going to focus on two. To put it simply, the first issue is whether Defendant Plocher Construction owes a duty to the plaintiffs to protect against a criminal act of a third party, and the defendant here would posit this is a superseding criminal act. The second issue is whether the plaintiffs or whether the court erred, rather, in admitting medical bills into evidence, plaintiff Mr. Watson's medical bills, without testimony from a physician with respect to a greater portion of those bills, showing that the medical treatment reflected in those bills was necessitated by the accident. And the third issue deals with whether an insurance company's summary of defendant's employee's statement about what was being done to secure this man lift hearsay was properly admitted by the trial court. With respect to facts of this case, I mentioned briefly that the plaintiffs were heading down Highway 255, Interstate 255. The defendant construction company here, Plocher, was actually performing bridge expansion work. They were on the Prairie Point Levee, which is part of the Illinois Department of Transportation area. They were occupying the space. They'd been there for about four months. The company had been there for about four months. The man lift itself was rented from one source. This area's levee is surrounded by cornfields on some of the sides. There's a neighborhood about a half a mile away. There are two canals full of water that surround the levee district. There is a sign that says no trespassing at the cable gate. And the man lift in question was restored by Defendant Plocher during the four-month period while it was in use. With the boom down and under the bridge, Defendant's owner, Gene Plocher, testified that it's the standard in the construction industry to either hide the key on the man lift so that other subcontractors, when they come to do work, can move the piece of equipment. It's a very large piece of equipment. It only goes about five miles an hour. Or the key will be stored in the trailer. This was actually on a Friday evening, early Saturday morning, over the weekend. And granted, I'm reading out of the athlete's brief on facts here, but it says, the Plocher supervisor in charge testified at trial that keys to the man lift were usually stored off-site, locked in a trailer. It was also surrounded by a six-foot chain link fence. Is that accurate? No, he said they usually were stored. I think they were stored either in the trailer, often on weekends, or they were stored routinely on the man lift because of the subcontractors that would come on the job site. Hidden on the man lift? Yes, hidden. And in fact, it was specifically testified to by, I believe it was Dave Campbell, the supervisor, they were left often stored up on a frame or by the battery. If it wasn't foreseeable to Plocher construction that someone might come and start up this man lift, why did they hide the key or put it in a trailer behind a six-foot fence? Well, I think they stored that, and it's admitted in the deposition that it was for safety reasons, to prevent theft, to prevent somebody starting it up. Right. So it was foreseeable to them that somebody might do that. Well, it's not foreseeable that somebody would commit a criminal act. I think the rule... Theft is not a criminal act. Vandalism, moving the man lift up over trespassing on property, vandalizing the ignition to the man lift. In fact, the man lift started without a key after the accident. The inference is, based on the evidence of this case, the man lift required a key before, and afterwards, it started without a key. Judge Quito specifically found that the key was left on the man lift in his judgment, right? I don't believe he said it was specifically found on the man lift. I think there was testimony that... Plaintiff proved by a preponderance of the evidence that the key was left in the man lift, in an area, in a manner that was perceivable that an intruder could and did move the man lift, causing injury to the plaintiff. That's the first sentence in his order. That is, in his order in the trial transcript afterwards, when I spoke with Judge Quito about the record, he asked me about what evidence there was as to where the key was, whether it was on the man lift or the trailer, and there was no evidence where the key was actually placed. I think that the court reached that conclusion just based on the general practice of the company. There was no specific testimony from anyone, any of the employees, saying, you know, I set this key on the man lift that Friday evening before the week. But it does say that in the order that that, you know, in that area, by a preponderance of the evidence. You dispute that one of the defendant's employees said that this was a high-crime area. The plaintiff claims that that employee said that it was a high-crime area. That's the record. Right. That is the record, and again, this is more of a broad-brush approach, and this really is the crux of the issue. The Cahokia area, I think, one of the employees, and I believe it was Mr. Caminetti, testified that he thought that that was a high-crime area. Dave Vandalue testified he was uncertain, depends on what you compare it to, but with respect to the levee district, this canal area, the area where they were working on the bridge, surrounded by cornfields on three of the sides and in a neighborhood about half a mile away, there was no crime. In fact, the evidence shows in this case, the record reveals, that defendant Plocker Construction had no prior thefts on that job site the four months they were there, no one vandalized any of their equipment, no evidence of trespassing, no evidence of theft. And in fact, the only evidence, it's a scintilla of evidence, it's a threat, and it's not enough, is what plaintiffs point to, it's some graffiti on the bridge, and it appears to be from the 1980s, some leftover cigarette butts, and some empty beer cans. Didn't Plocker or somebody in the defendant's construction company testify, it's a standard in the industry not to just leave keys in these equipment, because wherever you leave it, they get vandalized. I mean, you see these kind of cases all the time, where kids steal farm equipment and drive it around. There was a point where Gene Plocker testified that he wouldn't leave the key sitting in the ignition, just there in the ignition where someone could turn it on, that the key would be hidden on the mandler. I mean, in other words, the construction industry is aware that this is a concern, a safety issue, that somebody might, no matter whether it's high crime area or not high crime area, somebody might come to where they've got their equipment parked and decide to drive a bulldozer around or something. And it's happened. It has happened, and there are cases on that, and I think that they always hide the key, that's the testimony. The general rule is there's no duty to protect against the criminal act of a third party unless it's foreseeable. If you're taking precautions against that problem, how can you say it's not foreseeable? Well, that's the issue where this crosses the line. It's one thing to come in and somebody spray paint a vehicle, that sort of thing, but for someone to move the vehicle, jimmy the manlet, that's the inference, the ignition, lift the bucket up, drive it up over the highway and leave it up over the highway is something that's not foreseeable. Well, do you have to foresee the specific exact thing? No, Your Honor, you have to foresee the same sort of risk. And if you look at the other cases that have touched on this point, if you apply Lutz and Lundt in these cases, you would be looking for prior acts of vandalism or trespass on this property while the Senate blocker was there during those four months. They're not the landowner, they're an occupier, but I think for purposes of this argument it makes a distinct difference. But there was no evidence of that. It would be one thing if someone had trespassed on the property or damaged some of the construction equipment or tried to move some of the equipment. There is absolutely no evidence of that. In fact, to the contrary, everybody there on the job site said they had no prior thefts or vandalism while they were there for four months. So applying these cases, we're looking for some type of prior act involving the same risk. And there is no prior act. If we had somebody moving equipment and we didn't know who moved it or we had a key missing, that would be a similar risk that these courts address, imposing a duty on a defendant for liability for a criminal act. So if it only happens one time, then there's no liability on behalf of the blocker? One time prior to this incident? One time this incident. I believe that's the case. That's what the law says. Generally, there is no duty for a defendant blocker to protect against a criminal act of the third party. The highway patrol officer who investigated this concluded this was a criminal act of vandalism. That's his testimony, that's his report. Plaintiffs can see this in their brief. We have to show that it's foreseeable. Is it foreseeable that someone is going to commit this criminal act? In the cases that address this, say we look for the same risk. We look for these prior acts involving the same risk. There were no prior acts at all involving the same risk, period. Even if the defendant was somehow negligent in how they hid the key or put the key in the trailer versus on the piece of equipment, that liability is cut off when there's a criminal act, even if the defendant is negligent. I'm not getting my question. Why do you need a prior act if the owner of the company has already recognized that this is a risk, that someone can start up and drive or do something with this equipment? And because of recognizing that risk, he either hides the key or he puts it in a locked trailer behind a six-foot fence. He's clearly recognized there's a risk. That's why he's doing those things. Yeah, that is true. There is a possibility that someone could find the key and move him in. I mean, he didn't need somebody to do it once for a light bulb to go off and him say, ooh, I never thought about that. Somebody might start all over again. An approach to that would be having a ride-on lawn mower in your backyard that you leave the key in while you run inside and grab a refreshment or a glass of iced tea. Or if you take your key in while you leave it outside, it's the same sort of thing. It's always possible that somebody could come and take your car that's sitting in your driveway if you leave your door unlocked, or someone could come and take your ride-on lawn mower and drive over the neighbor's property. That's always possible if there's a criminal act where the court's going to impose a duty on a defendant to foresee that. That's the issue. It's in the defendant's best interest to try and protect their equipment and protect their property, as we all live with our own personal property, our vehicles, our lawn mowers, that sort of thing. But there's no duty imposed. Just because, let's say, you leave your vehicle unlocked in your driveway, somebody could come along and jimmy your car and start your car and drive off down the highway and cause a wreck. We know that that could happen. Typically, we take our keys with us inside the house. We don't leave them in our car. But if we left our car door unlocked or left the key in the seat, that doesn't impose a duty on us to protect someone from the criminal act of a third party. That's where we're talking about. They didn't take the key this time, though? No, there's no evidence that they took the keys. In fact, the evidence is that they jimmied the lock, started the ignition without the key, The defendants didn't take the key with them every day? No. No, they left it hidden on the vehicle or stored in the trailer, depending on what they did with it. And that complies with the industry standard according to Gene Blocker, whose testimony went unopposed as far as what the standard was in the industry. But even if Defendant Blocker was somehow negligent as to where the key was placed, the criminal act of these trespassers, vandals, would cut off that liability because that's not foreseeable. Just because Defendant Blocker takes steps to protect the property, just as we all do, doesn't impose a duty to protect against those criminal acts. As stated earlier, it's undisputed that this was a criminal act. If you look at some of these other cases, in fact, I talked about the case involving, I believe it was the Roe case, Roe v. State Bank, where the attacker came onto an office complex, shot one of the plaintiffs who died, and then shot another plaintiff, deceived rather, and then also shot one of the plaintiffs who survived. The court looked at prior incidents on that property. The court focused on what prior incidents the defendant was aware of, and the court noted that there were two prior incidents of someone entering the complex, stealing things, without any evidence of forced entry. And the issue in this case was whether the defendant was negligent for allowing a grandmaster key and a master key to float around there without any idea of where it was and who had it, allowing the attacker to come in, the defendant to come in, and cause a serious bodily harm. The court noted that's what we're looking for. We're looking for the same sort of risk. If you have somebody entering your property, stealing things, without any evidence of forced entry, the inference is they have a key. That's something you should be aware of, and there was evidence before that they saw the defendant running around with a set of these keys. There's no evidence of that in this case. That's what we're missing. We're missing some type of prior act of the same risk to impose a duty on the defendant wants it. Besides foreseeability, that's not the end of the analysis. The court also focuses on other factors, including the likelihood of injury, the magnitude of the burden to guard against it, and the consequence of placing the burden as a defendant. Even if, let's say for example, we'll assume here a defendant, Bacher, hid the key, took the key off the site so the key wasn't even available for anybody who might be trespassed. The defendants here, based on the evidence and the inference, were still able to jimmy that man lift and move that man lift to guard. The prior fact found that the key was left in the man lift. That is in Judge Credo's, or in that area, yes. I mean, so that's been determined as far as the facts in the case. You haven't directly challenged that finding on appeal. And I don't dispute the fact that the key could have been left. He says it was. That's his conclusion. It was left on the man lift. Hidden on the man lift is actually the testimony. That's what they do. That doesn't end the analysis. The fact that they left it on the man lift, hidden on the man lift, is not in and of itself negligent. In fact, it complies with the standard of care. Well, I understand that. But what I'm getting at is, you know, you're characterizing the facts such that there was no key, that they started it without a key, and that's not what the court found. And, you know, you're talking about how can they guard against. Their argument is they can get rid of the key and not leave it there and they can start it anyway. That's not what was found to have occurred. I think the court found that the key, based on the evidence that was left in that area on the man lift, there was evidence, and I don't think the court speaks to that issue in the judgment, there was evidence that the man lift required a key before, this is in the record, before the accident. And then after the accident, I believe Dave Vandily was able to move the man lift without a key. If the man lift had been operational without a key prior to this accident, Dave Vandily testified he would have taken it back to one source and said, we've got a problem here, this thing, you can just start it up and take off with it. What burden, that there would be a heavy burden placed on defendant Plocker here to try and guard against this, I mean, we're talking about trying to chain up a vehicle that has tracks, which Dave Vandily testified would not work, to try and pull the battery cable off to disable the battery. We have other safety factors involved there. This isn't even defendant Plocker's piece of equipment that's rented from another source. For them to do something that would alter the condition of the equipment may not even be allowed. And second of all, this isn't even the property that they're occupying, they don't own this property. For them to try and place other security measures there would be cost prohibitive, it would affect the bid being placed on this job, and it would be difficult since they don't own this property. So there's a number of factors here to be considered for defendant Plocker to try and foresee this and guard against somebody trespassing on the property contrary to a gate, no trespassing sign, vandalizing equipment. And then the gall and, quite frankly, the criminal act of operating this vehicle and lifting the man lift over 255 is something that's not foreseeable. Based on these arguments, the defendant here, defendant Plocker, requested the court reverse the trial court's judgment since defendant Plocker owes no duty to protect against the criminal acts of a third party since there were no evidence of prior criminal acts of the same risk. Thank you. Thank you. We'll give you a chance to rebuttal here in a few minutes. Thank you. Mr. Caraway, you may proceed, sir. Justices, may it please the court. Counselor, my name is Jason Caraway from Culver Law Offices. I represent the Watsons in the matter before the court today. I will directly respond to the arguments raised by counsel and then hopefully have some time briefly at the end to discuss the evidentiary issues that counsel wasn't able to bring up. Some important facts were left out when we heard this story the first time. Certainly, Plocker Construction had a man lift. Certainly, it was under the I-55 bridge near 157 in the Cahokia-Centerville Triangle in St. Clair County. And certainly, they were using it to work on the bridge. But if you look at Petitioners' Exhibits 3 and 5, the construction manager himself says, After work concluded on a Friday, May 13, 2005, the key to the man lift was left inside in an unlocked panel. Those are the facts of this case. We have a deputy from St. Clair County who in the past has been assigned to a high crime task force. Deputy Scott Perkle, who's patrolled this area, who knows about this area, testifies it's a high crime. There are some evidentiary objections to Mr. Perkle's testimony, which are addressed in my brief. But I'll address those now while we're here. He's a police officer, so police officers do. It's not a fry issue, as counsel will lead this court to believe. He testified to it. That's his testimony. Did the defendant ever ask for a fry hearing? No. No, Justice Stewart, they did not. This area where the man lift was stored is 800 feet from a very run-down residential neighborhood, which primary sources of business include strip clubs, bars, and liquor stores. To get from that neighborhood to this area was made, testimonies show, a 10-minute walk and less than a minute drive by car. In the very area the man lift was, there weren't signs from the 80s. There were signs from that week. Right after the accident, Mr. Watson investigated the area, and there were cigarettes, beer cans, and certainly the bridge contains graffiti, gang-related graffiti, swastikas, 666s, and obscenities. And what did Parker do? They closed up shop on Friday and left the key in there. Nobody disputes criminals vandalize the man lift. What did they do? They started the man lift, and this argument about whether it's jimmied or not, it's not in the record. It's not on the P-Glo. Judge Guido found that the key was left in the lift, and the lift was elevated. Oh, it was elevated over the time of I-255. When the Watsons, a tandem truck driving team of 30 years, ran into it, sheared the top of their car off like a tuna can. Pressure inside the cabin went crazy. Thank goodness the wife was asleep in one of those protective slings in the back, and everything came flying out. Those are the facts. I agree that whether or not this court finds a duty and agrees with Judge Guido is a matter of law. It's de novo review. And I agree with the test that's been given to you today. Is it reasonably foreseeable? Of course it is. When we look at what reasonable and what foreseeability means under Illinois law, certainly we look at this general rule where there is no general duty to protect against the acts of a criminal trespass, but that's why there's the exception. This case is the exception to that rule. When defendants should reasonably foresee not the same criminal act, that's not the law, but a criminal act could occur. That breaks the general rule and falls into the exception which establishes the duty. Let's look at the same case opposing counsel talked about in Roe. It illustrates the point. Roe is a case where the landlord has a set of mastery keys. He mishandles the keys, doesn't keep track of the keys, allegedly somebody gets a hold of the key, breaks in, and then murders one person and nearly kills the other. What does the court say in Roe? Owner of the premises failed to keep track of the keys. Master keys used to gain access to the building which resulted in an attack. What's the holding of Roe? The holding of Roe is by retaining access to the keys, defendant assumed the duty to take reasonable precautions to prevent unauthorized entry. There's nothing in the Roe decision about specifically, as Justice Wexler pointed out, is this the one time when this is okay? There's nothing about that in Roe or in the law that Roe is based on. Precautions to prevent unauthorized entry. What did Plotner do? They left the key in a man lift in a high crime area on Friday afternoon and walked away. Now, in Love's case incorporates the old test we all know, that Carroll Towing Company test. There should be this weighing then after we get to that point. What's the burden on the defendant of doing whatever it is they should have done versus the gravity of the harm and the likelihood of the harm? What do the facts say about that in this case? The facts are they had an on-site trailer where they locked everything else up with a six-foot fence around it. Furthermore, what would the burden have been that day to take the keys back to that trailer? I say the burden is slight of none compared to the gravity and likelihood of harm by leaving a man lift which can be operated and put in the middle of oncoming traffic on the interstate in a high crime area. Certainly, we should not try and open injustices. This case isn't a case that's going to open floodgates of litigation on this reasonable foreseeability issue. It's not that case. So, Gene Plocker himself testified multiple times in the case, deposition, and trial. And you can read by the court's order that Judge Guido questioned Mr. Plocker's credibility. But to follow up with Justice Stewart's line of questions, Gene Plocker was right about one thing. He knew that things get stolen on construction sites. He knew that. Brent Henschen, who's an employee of Plocker, Dave Vanderwood, their construction manager, all these people, look at the record, they all testified. Stuff gets stolen on construction projects. That's why we have a trailer. We have a trailer with a fence around it. So I say the burden that day, that Friday afternoon, was very slight. And certainly based upon the law that we have, it was reasonably foreseeable. Counsel tried to illustrate his point about why it wasn't foreseeable by talking about lawnmowers and iced tea. That's a different case. It wasn't in a high crime area. It was gone for five minutes. It's different. And he talked about leaving your keys in a car where somebody comes and steals it. Well, that's the Rule v. Reynolds case that's in my brief. Theft of a car was foreseeable when the keys were left by folks in a high crime area. Certainly that's foreseeable. I agree with it. Okay. And those are the facts before the court. Those are the facts that Judge Guido had in front of him. In light of those facts and in clear case law, certainly the defendant owed a duty. Did they breach the duty? Yes, they did. Judge Guido found they breached the duty. What did they do? They left the man lift on Friday afternoon with the key inside the ignition panel unlocked. Those are the facts of this case. And so when we talk about review of breach of duty, justices, that's a different standard. That standard of review is against the manifest way to the evidence and not to find breach. And in my opinion, breach may not even be on appeal. It's not mentioned in the brief, but going to breach only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence. Clearly, Judge Guido, the ruling is not against the manifest way of the evidence with regards to defendant Plocker's breach as they owed a duty. The defendant attempts to distinguish Roe by saying that the injury suffered must result from the same risk. How do you respond to that? Thank you, Justice Wexler. In Roe, we have our facts that say you have keys that are missing. Somebody breaks in and burglarizes. No, Justice Wexler, when they broke in, they actually assaulted the people who were there. I don't think Roe stands for the proposition that it has to be the same criminal act that's foreseeable, as your point was earlier. But if we're going to say that Roe stands for the idea of risk, risk to who? I would answer your question, risk to others. Was there a criminal risk in Roe that by losing track of keys, somebody could burglarize the facility? Yes. In that case also, Justice Wexler, there's also the same risk of somebody breaking in and assaulting somebody or battering somebody. So I respond to the question by saying what the court looks at, is it reasonable for a criminal act to occur? I don't think in Roe there are two risks, actually. There's the risk of being burglarized and theft, and then there's the risk of actually what happened, which is a murder and an assault. So I do not think Roe stands for the proposition, nor should this court extend that in its decision today, that it has to be some kind of identical criminal act. I don't think that's what the law says. It doesn't have to be an identical risk. It has to be a risk. What's the risk in this case? The risk was that vandals were going to operate a man lift and hurt somebody, and that's what happened. Let's talk about the evidentiary issues if I can for a few minutes. The defendant argues that the trial court erred in admitting the majority of plaintiff's medical bills. The standard of review is important. That standard of review is abuse of discretion. There was no abuse of discretion in admitting the medical bills. In the defendant's brief, it relies on Westlake, the self-defeating argument. The holding of Westlake is that a trial court can admit bills based upon the circumstantial evidence of the case that the records and bills were related to the accident. What's the testimony in this case that Judge Quito had? The plaintiff himself testified he had no problems with his back neck or vertigo issues prior to the accident. Two doctors, Hargreaves and Irwin, testified the back neck and vertigo problems were related to the accident. The defendant completely ignores the plaintiff's testimony the bills were incurred as a result of the accident. That testimony is sufficient enough under the case clocker sentence. Westlake? Was there an agreement to admit the medical bills? Justice Stewart, that's a very good question. And as you've read the record in the briefs, there was a longstanding issue about these bills. At one point, it appears foundation was agreed to. Then, trying to be polite, maybe retracted at the last minute, there was a request to admit sent that wasn't sufficiently answered. At motions in limine, you see Judge Quito had the same question. And he said, look, if your client testifies that he paid the bills, they're coming in. I'll address those issues as the causation, approximate cause, but they're coming in for their right. And so there was a history, if you will, Justice Stewart, of whether these bills were going to be objected to or not. Ultimately, they came in. And under Westlake, they should have came in. Because, as you know, Judge Quito, as a trial court judge, can look at the circumstantial evidence around the bills and say that they're coming into evidence and then view the weight of the testimony that supports it. So you're arguing more or less a chain of events type analysis? Yes, Justice Stewart. Even on that basis alone. But if the court wants to look and actually look at the records that were in, you can see in our brief that we have Dr. Fuster, Dr. Samby, Heartland Rehab, Dr. Janicek, Shands Hospital, Envision, and Southern Open MRI, which all the bills clearly state that treatment is for the accident, for the specific truck driver. So I think it's a twofold argument, Justice. It's certainly the chain of events argument that Westlake sort of allows trial court judges, but also the records themselves, I think, support the inference. Defendant argues that, but wait a second, there's a gap in treatment. Again, standard of abuse, abuse of discretion, two doctors linking it up. And it's actually unrebutted why Mr. Watson had a gap in his treatment. This was treated as a Florida workers' compensation case. And so the respondent insurance carrier in Florida wouldn't authorize any treatment. It's unrebutted that that's the reason he didn't receive treatment. Defendant will also argue that the pension statement should not have been admitted. That was his third point. I think it's important to know, Justices, that we have a disagreement on the standard of review on this issue. The defendant argues that the Justices in this case should apply a de novo standard, but that's not the proper standard. The proper standard is abuse of discretion. The defendant acknowledges the general standard for these kind of admissions is abuse of discretion, but argues that the de novo review is appropriate with this criminal case, the People v. Munoz case. Simply put, Munoz is not on point. Munoz deals with words allegedly spoken by a decedent prior to an alleged suicide. In that case, the court pointed out criminal case law that hearsay statements by a decedent as their intent to commit suicide are required to have contemporaneous acts in order for them to be admitted. It's a criminal case. It's a different standard. It shouldn't be used. And it's simply not applicable in the instant case. Further, with these statements that they want to keep out that were prepared statements by a woman named Mrs. Graybill, there was an earlier deposition of henshin. He answered all the questions that are in the statement in his deposition. Gene Clocker himself testified that he relied on the very statement they want to be kept out. Did henshin testify? Yes, sir. And was he asking about the statement about whether or not he started without a key? I believe he testified via deposition, Justice Stewart. Was that submitted, though, to the court as part of the evidence? Yes, Your Honor. And in the deposition, did he either verify or not verify this alleged statement? His statements were consistent, Your Honor. Okay. So it came in that way anyway. Correct. And so it's cumulative in nature, and so there's no error even if there would be harmless error. Again, I think that going back to the high primary, you can read the briefs, and, of course, there's good argument, that this deputy Pirtle's testimony was proper. As Justice Stewart pointed out, they want to make it a fry issue. It's not a fry issue. It's not novel or scientific. No fry. What's the relevance, whether it's a high primary or not? Thank you, Justice Waxman. I'll use counsel's example of a lawnmower in his backyard with iced tea to illustrate the answer. I know it goes to foreseeability, okay, but still, the first time it happens, if it's never happened before, there's no liability under that theory, right? Correct. And I, of course, disagree with that. The test is we take all of the factors, Justice Waxman, and we take them all together. You have reasonable foreseeability, and what's the test for reasonableness? You look at all the facts, and part of the facts in this case are this is a high primary. For all these reasons, Justices, the Plaintiffs' William and Selma Watson ask this court to affirm Judge Guido's order in every way. Thank you for your time. Thank you. Fairway? Counsel? Guido? With respect to the Roe case cited by Plaintiffs' counsel, it's unique and really distinguishable from the present case. One of the exceptions to the duty or no duty to protect against a criminal act of the third party is if there's some sort of special relationship. In Roe, we dealt with a landlord-tenant, and the landlord undertaking certain duties to protect the tenant involving the keys, safety measures, that sort of thing. Here, there was no special relationship. The plaintiffs were not defendants, invitees, or tenants, or anything like that. So Roe is distinguishable in that respect. With respect to Deputy Pirtle— Did the defendant ask for a frat hearing? No, there was no frat hearing. There was a talk in your brief about the fry and everything. Don't you have to ask for a hearing? Yes, you have to ask for a hearing. There was no frat hearing on that, Your Honor. The whole point is that Deputy Pirtle was brought into this case to testify to try and make another attempt to show notice to defendant Plotker by saying that this area, this levy district, and they bring in Cahokia to tie this together, is a high crime area. What's the point of that? Well, that's one of the ways we're trying to show notice. Deputy Pirtle laid out what his methodology would be, what his methodology would be, what he would have to go through. And one of those things he mentioned was looking at 911 calls, looking at similar complaints in the area, comparing this area to other areas. And when I went through that with him, he did not do any of those things. That's what he said he would need to do. Now, he rendered the opinion that this Cahokia area is a high crime area based on his experience. But when I asked him about this levy district where this construction work is going down and this incident took place, he said, I'm unable to say that this is a high crime area. I can't say that. I can tell you that the Cahokia area is, but I can't speak to that issue. So really, Deputy Pirtle, the plaintiffs don't need that high crime showing to show notice. It's not enough to have a high crime area nearby? Well, the only evidence is that Cahokia is a high crime area. I mean, St. Louis City is a high crime area. And it's nearby. It's nearby, but that's the issue. I mean, if you look at the evidence, you look at the photographs, it's a half a mile away from this neighborhood. I don't know if that neighborhood is a high crime area or not. I don't know if that was spoken to or addressed. The actual levy district is in a bunch of cornfields with canals and no trespassing sign. It's secluded. And obviously, the plaintiffs have presented their case and tried to say, well, Cahokia is a high crime area, and this is somehow part of Cahokia. Therefore, it's grouped in with it. Normally, there's not anything worth stealing out in the cornfield. Usually not. But then you park a bunch of construction equipment there, and it might attract somebody's attention. That's an argument. Well, actually, I don't think the plaintiffs got to that argument, and I don't think there's any type of attractive nuisance or anything like that. In fact, the defendant cites to Herring v. Humphrey. It's a North Carolina Supreme Court, which has facts that are identical to this case involving a bulldozer left in a vacant parking lot. The neighborhood kids come over, start it up, drive it off, and jump out and cause us some property damage. The court said, look, this is not foreseeable. There is no duty to protect against these criminal acts. And we're dealing with the same issue here. So you believe that Roe says that to establish foreseeability, it has to be the same type of act that happened before? Not the same act, the same risk. And the court actually speaks to that issue and says it doesn't have to be the identical criminal attack or criminal incident. It has to be of the same risk, the same issue. And what do we have here? Well, we don't have anything during those four months. We have absolutely nothing. Cigarette butts that were seen after the accident, some empty beer cans, some graffiti. And graffiti is on probably the majority of underpasses from here to Chicago. How many beer cans? There was a few, five or six beer cans, five beer cans. I thought you said 50. No, no. That would be a different issue. Just a few beer cans. No, just a few beer cans. But what is the evidence in this case? It's still the same risk. Well, there is none. There's no trespassing, no evidence of vandalism of the equipment on this job site. And that's really what is required to impose a duty on defendant blockers to protect against a criminal act. First time free pass rule. First time it happens, you get a free pass. Yeah, how are you supposed to know? How is that foreseeable if you've never had this happen before? If you're at your house and you've never had somebody come and steal your car, the apartment complex up the road might be subject to some criminal acts there. But if you've never had this happen, how are you supposed to know? It's not retrospect. It's nothing from the plaintiff's or the defendant's standpoint. All right. Thank you. Thank you both for your briefs and your arguments. We'll take this matter under advisement.